AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
District of Nebraska

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>$108,919.36 United States Currency in JP Morgan Chase Bank Account Number 350818305 in the Name of "Vines Investments Inc." | ) ) ) ) ) Case No. 8:19MJ505 |

### APPLICATION FOR A WARRANT
### TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of **Nebraska** is subject to forfeiture to the United States of America under **21** U.S.C. § **881 and 853** *(describe the property)*:

$108,919.36 United States Currency in JP Morgan Chase Bank Account Number 350818305 in the Name of "Vines Investments Inc."

The application is based on these facts:
**See attached affidavit**

☑ Continued on the attached sheet.

_____
Applicant's signature

S.A Jacob Foiles, FBI
*Printed name and title*

Sworn to before me by telephone or other reliable electronic means.

Date: 10-23-19

City and state: Omaha, Nebraska

_____
Judge's signature

Susan M. Bazis, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In the matter of:<br><br>$108,919.36 United States Currency in JP Morgan Chase Bank Account Number x8305 in the Name of "Vines Investments Inc.," and<br><br>$37,423.79 United States Currency in First Republic Bank Account Number x2996 in the name of "Ashton B Vines." | 8:19MJ505<br><br>**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS** |

I, Jacob Foiles, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. This affidavit is in support of the United States' Application made pursuant to 18 U.S.C. § 983(b), 18 U.S.C. § 981(b), and 21 U.S.C. § 853(e) and (f) by 18 U.S.C. § 982(b)(1), to seize funds illegally gained by defrauding Omaha, Nebraska-based Malnove Holding Company, Inc. (Malnove).

2. I am employed as a Special Agent of the Federal Bureau of Investigation (FBI), and am assigned to the Cyber Task Force of the Omaha Field Office in the District of Nebraska. I have been employed by the FBI since November 2014, including five months of training at the FBI Academy in Quantico, Virginia. Subsequent to my initial training at the FBI academy, I have received additional training in the investigation of computer and financial related crimes. Previous to my employment with the FBI, I obtained a Bachelor's degree in Computer Engineering, and was employed in the information technology industry for almost seven years. As a result of my training and experience, I am familiar with information technology and its use in criminal activities. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested seizure warrant and does not set forth all of my knowledge about this matter. This affidavit is based upon information I obtained from my investigation. This affidavit also contains information that I learned from third-parties; and I do not have direct knowledge of each and every fact set out below.

4. Because this affidavit is being submitted for the limited purpose of seeking a seizure warrant, I have not set forth each and every fact learned during the course of the investigation, nor is this affidavit intended to be a complete and detailed description of all the events and/or conversations occurring during the course of the investigation of the matters described herein. Facts not set forth herein are not being relied upon in reaching my conclusion that a seizure warrant should be issued, nor do I request that the Court rely upon any facts not set forth herein in reviewing this affidavit.

**GROUNDS FOR FORFEITURE AND SEIZURE**

5. The funds to be seized constitute, or are traceable to, proceeds of the fraud scheme and are therefore subject to seizure and forfeiture as proceeds of wire fraud and wire fraud conspiracy, committed in violation of 18 U.S.C. §§ 1343 and 1349 and are thus subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) (as proceeds).

6. There is also evidence of concealment money laundering transactions committed in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h), as well as 18 U.S.C. § 1957, which subjects the funds to criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1)(A) (as "involved in" money laundering) and 28 U.S.C. § 2461.

7. Funds subject to forfeiture are subject to seizure under both the civil seizure statute, 18 U.S.C. § 981(b), as well as the criminal seizure statutes, 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

## PURPOSE OF THE APPLICATION

8. The purpose of this application and affidavit is to set forth facts establishing probable cause to support issuance of the requested seizure warrant.

9. The purpose of seeking the seizure warrant is to preserve the availability of the property. Without seizure, probable cause exists to believe that the funds in the accounts will be removed from the jurisdiction of the court or otherwise made unavailable for forfeiture.

## PROPERTY TO BE SEIZED

10. This application is presented in support of issuance of a seizure warrant for the following property, namely funds in the following accounts (the "Target Accounts"):

    a. $108,919.36 U.S. currency in JP Morgan Chase Account Number x8305 in the Name of "Vines Investments Inc.;"
    b. $37,423.79 U.S. currency in First Republic Bank Account Number x2996 in the name of "Ashton B Vines."

## INVESTIGATION

11. The FBI investigated a Business Email Compromise[1] (BEC) scheme to defraud the victim, Malnove Holding Company, Inc. (Malnove), of $2,009,071.54 United States currency. Malnove is a packaging company headquartered in Omaha, Nebraska.

---

[1] Business Email Compromise (BEC) is a sophisticated scam targeting businesses and individuals that regularly perform wire transfer or ACH payments. A BEC scammer attempts to use email in order to defraud a business or individual of money.

12. An unknown subject(s) gained unauthorized access to the email account of K.H.[2], a buyer at Malnove. This access was then used to redirect a total of ten (10) Automated Clearing House ("ACH") payments intended for Graphic Packaging International ("GPI") for legitimate products or services provided to Malnove.

13. The unknown subject(s) also registered and used the "look-a-like" domain name[3] "graphlcpkg.com". This domain name looks very similar to GPI's legitimate domain, graphicpkg.com, but contains an 'L' instead of an 'I'.

## FACTS ESTABLISHING PROBABLE CAUSE

14. On February 27, 2019, the unknown subject(s) sent an email from gpicare@graphlcpkg.com to B.C., an accounts payable clerk at Malnove, and Malnove buyer K.H. The email appeared to be sent from an employee at GPI and requested that Malnove update the payment method for GPI. A subsequent email sent later that day from the same address specifically requested that all pending and future payments be sent via ACH to Bank of America (BoA) account x8909. These emails were later determined to be fraudulent and were sent from an email account using the "look-a-like" domain name described above.

15. Later on February 27, 2019, Malnove accounts payable clerk B.C. sent an internal email to Malnove buyer K.H. asking for confirmation before making the payment change. An email was sent from K.H.'s email account to B.C. confirming that this payment change should be made. This email was later determined to be fraudulent.

16. Between February 28, 2019 and March 21, 2019, Malnove sent ten (10) ACH

---

[2] The names and personal details of the individuals involved in this investigation have been replaced by their initials to protect their identities.

[3] A domain name is an identification string that defines a realm of administrative autonomy, authority or control within the Internet. Domain names are formed by the rules and procedures of the Domain Name System (DNS). Examples of domains include "fbi.gov," "google.com," and "yahoo.com."

payments totaling $2,009,071.54 to BoA account x8909.

17. On or about March 25, 2019, BoA contacted Malnove and asked that Malnove verify the recent ACH payments. At this point, Malnove discovered the fraud scheme and contacted their bank to report the fraudulent ACH transfers.

18. On March 25, 2019, K.H. emailed B.W. at GPI and notified him that Malnove had "found a compromise in the payment process" between Malnove and GPI. Later that evening, B.W. received another email from K.H. that stated:

> *I just got off the phone with my accounting department now, I am glad we didn't set up any payment on the new account. we will have all your payment main account. this is just a head up for all.*

On March 26, 2019, B.W. received another email from K.H. with similar language:

> *Thanks for the update Ross, I spoken with my accounting department now, I am glad we didn't set up any payment on the new account. we will have all your payment sent to your main account. this is just a head up for all. I will call you later in the day as I need to take my son to the hospital.*

While the first email sent by K.H. to B.W was genuine, the following two were determined to be fraudulent.

19. The BoA account that received all ten (10) of Malnove's fraudulent ACH transfers, account x8909, belongs to James M. Dunbar of Missouri. Records obtained from BoA indicate that the account had no deposits or withdrawals the six months preceding the first ACH transfer from Malnove.

20. After the first Malnove ACH transfer was credited to Dunbar's BoA account on March 1, 2019, there are a number of withdrawals and outgoing wire transfers. A summary of this activity follows:

  a. On March 4, 2019, $12,000 is withdrawn as cash;
  b. Between March 4 and March 21, 2019, $859,049.90 is wired to JP Morgan Chase account number x8305 in the name of "Vines Investments Inc.";
  c. Between March 18 and March 21, 2019, $296,568.39 is wired to BoA account number x7317 in the name of "Shelby R Carter Sole Prop";

      d. On March 18, 2019, $265,000 is wired to Central Trust Bank account number x6587 in the name of "James Dunbar."

21. BoA account x7317 belongs to Shelby R. Carter of Los Angeles, CA. The account was opened on March 12, 2019, just six (6) days before receiving the first of three wire transfers from James Dunbar's BoA account. The day after receiving the first wire transfer from James Dunbar, on March 19, 2019, two outgoing wire transfers are sent: $76,223.15 was wired internationally to a bank account in Hong Kong and $25,357.16 was wired to First Republic Bank account x2996 in the name of "Ashton B Vines." The day after receiving the second wire transfer from James Dunbar, on March 21, 2019, another two outgoing wire transfers are sent: $73,880.00 was wired internationally to a bank account in Thailand and $19,453.17 was again wired to First Republic Bank account x2996 in the name of "Ashton B Vines."

22. On March 26, 2019, Malnove reported the incident to the FBI.

23. On April 19, 2019, FBI agents interviewed James Dunbar. Dunbar indicated that he was involved in an online romantic relationship with a woman he knew as Sandra Rose Davis. Dunbar said that Davis told him that the money Dunbar received from Malnove was from a large inheritance. Davis instructed Dunbar to send the money to several different recipients. Dunbar admitted wiring funds from his Bank of America account, to Carter Realty and Vines Investments at the direction of Davis. Dunbar also transferred $265,000 to his Central Trust Bank account. Dunbar also admitted that he withdrew $12,000 as cash and mailed that cash to Vines Investments in California at the direction of Davis. In addition, Dunbar said he obtained a cashier's check from Central Trust Bank for $78,982 and sent it to Frank Grimaldo in Colorado Springs, CO, also at the direction of Davis. Dunbar also said that he purchased several hundred dollars' worth of Amazon gift cards and provided those numbers to Davis.

24. On April 25, 2019, FBI agents interviewed Shelby Carter. Carter told the FBI

that she was working as Ashton Vines' assistant. Carter admitted that Vines directed her to open her Bank of America account and said he was a Bitcoin investor. Carter also said that before meeting and talking to the FBI, she called Vines and told him the FBI was trying to contact her. Vines told her not to talk to the FBI unless she wanted to go to jail. Carter said that she discussed work matters using the encrypted communication app Telegram with Vines. Carter also said Vines told her to delete all of their Telegram communications after hearing that the FBI had tried to contact her.

25. The FBI obtained bank records for the Target Accounts and determined that Vines received over $1 million between October 2018 and April 2019 when the Target Accounts were restrained. The accounts have numerous cash deposits ranging from hundreds to tens of thousands of dollars. The accounts also received funds from cashier's checks, money orders, personal checks, and wire transfers.

26. The U.S. Postal Inspection Service has interviewed several advance fee fraud victims that have sent cash, checks, or money orders to Vines. An advance fee scheme occurs when a victim pays money to someone in anticipation of receiving something of greater value – such as a loan, inheritance, investment, or gift – and then receives little or nothing in return. These victims fell for a variety of schemes including purported Federal grants requiring upfront fees, prize winnings requiring various advance fees, or investment opportunities. The victims were instructed to mail cash or otherwise send funds to Vines in order to pay these fees.

27. On May 30, 2019, FBI agents and U.S. Postal Inspectors executed a search warrant at Vines' residence in Los Angeles, CA. Several electronic devices belonging to Vines were seized pursuant the warrant. Additionally, several driver's licenses with Vines' picture but with different names were also found during the search.

28. Federal law enforcement officers interviewed Vines during the search. Vines said that he was a crypto currency trader. Vines also said that he bought and sold crypto currency – primarily Bitcoin – for various clients. Vines acknowledged receiving wire transfers from Dunbar and said this money was for the purchase of Bitcoin on behalf of a client. Vines also acknowledged receiving numerous packages containing bulk cash. Vines said this cash was also used to purchase Bitcoin on behalf of various clients.

29. Vines said that he met most of his clients on the website "LocalBitcoins.com." The LocalBitcoins.com website is a peer-to-peer Bitcoin exchange. A user can find offers to buy or sell Bitcoin for advertised exchange rates. Vines would generally communicate with clients he met on LocalBitcoins.com using the messaging application Telegram. Vines said he both bought and sold Bitcoin and generally made about 10% on these transactions.

30. Vines confirmed that he registered as a Money Services Business (MSB) with FinCEN. Vines said that he was aware of Anti-Money Laundering (AML) and Know Your Customer (KYC) practices. To verify the identity of his clients, Vines would often ask them to provide a photo of the client holding a driver's license.

31. Vines said that he often purchases Bitcoin from "The Columbians" because they offer favorable exchange rates. Vines said that he often meets people that are selling Bitcoin in a parking lot and provides the seller with cash. Vines said he would then direct the seller to send an agreed upon amount of Bitcoin into the wallet of a client that Vines is selling Bitcoin to or into Vines' Bitcoin wallet.

32. Vines claimed that he was not aware that any of the people that had sent him money in the past were fraud victims. Vines said the people that sent him money were looking to purchase Bitcoin. When asked about the driver's licenses with different names found during

the search, Vines acknowledged that he had obtained several fake driver's licenses. These fake licenses were obtained in order to send additional money through MoneyGram and Western Union. Both of these money transmission companies limit the amount of money that can be sent by a single person.

33. Vines provided consent for the interviewing agents to access and download Vines' LocalBitcoins.com transaction history. The downloaded spreadsheet shows that between March 16, 2018 and May 24, 2019, Vines had 161 Bitcoin purchases totaling approximately $930,650 and 336 Bitcoin sales totaling approximately $654,386.

34. Vines has never filed a Currency Transaction Report or a Suspicious Activity Report. *See* 31 CFR §§ 103.20 and 103.41; *see also* 18 U.S.C. §§ 1960 and 982(a)(1).

35. The United States sought and obtained a Restraining order in case no. 8:19CV164 in the U.S. District Court for the District of Nebraska to prevent the depletion and transfer of funds remaining in the accounts identified by the FBI.

36. Bank of America transferred funds in Shelby R Carter's bank account in the amount of $113,162.19 to Malnove.

37. Dunbar reached a Stipulation with Malnove and returned funds to the victim company from the accounts that Dunbar owned and controlled.

38. Vines sought and obtained representation from the Federal Public Defender's Office, Mike Hansen, Esq.

39. By agreement of counsel for Vines, Mike Hansen, the Restraining Order was extended to October 25, 2019.

40. Because Mike Hansen is a Federal Public Defender, and a criminal case is not pending, Mr. Hansen has indicated that he does not now represent Vines with regard to any civil

action, including an action for forfeiture *in rem*.

41.  On October 22, 2019, your Affiant contacted Vines in order to discuss the potential civil forfeiture of the funds in Target Accounts. Vines did not give his consent to extend the current restraining order. Vines claimed that at least some of the funds in both Target Accounts belonged to him and therefore he would contest the forfeiture of these funds.

## PROBABLE CAUSE THAT ALL FUNDS IN THE TARGET ACCOUNTS INDUCED AND ON DEPOSIT, DUE TO FRAUD

42.  Your Affiant is advised that probable cause is not a high bar and requires only a fair probability of certainty on which reasonable people, not legal technicians, would act. *See Kaley v. United States*, 134 S.Ct. 1090, 1103 (2014). As a law enforcement officer, when I have reason to believe that funds in the possession of a target of my investigation are the direct product of the suspected crime, I have probable cause to seize those funds.

43.  The funds in the Target Accounts subject to forfeiture, restraint and seizure were induced by the fraud upon the victim company. Money from the victim company is traceable to the Target Accounts. Thus, your Affiant has probable cause to believe that all funds in the accounts described in the above paragraphs are subject to forfeiture because those funds are all proceeds of the fraudulent scheme.

## FUNGIBILITY

44.  Your Affiant is advised that one civil theory of forfeiture allows the Government to forfeit funds on deposit in an account where, within the last year, funds subject to forfeiture have been deposited, without identifying the specific property involved in the offense. In pertinent part, 18 U.S.C. § 984(a) provides:

   a. In any forfeiture action in rem in which the subject property is cash or funds deposited in an account in a financial institution;
   b. it shall not be necessary for the Government to identify the specific property

  involved in the offense that is the basis for the forfeiture; and

  c. it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

45.  Your Affiant is also advised that, in essence, § 984 allows the United States to seize for civil forfeiture identical property found in the same place where the "guilty" property had been kept. *See United States v. All Funds Presently on Deposit at American Express Bank*, 832 F. Supp. 542, 558 (E.D.N.Y. 1993). I am advised that, by § 984(a)(1)(B), therefore, this affidavit need not demonstrate that the monies now in the Target Accounts are the particular monies involved in the scheme to defraud Malnove as well as wire fraud, mail fraud, and money laundering, so long as the forfeiture is sought for other funds on deposit in that account.

46.  Your affiant is further advised that the "fungibility" rule of § 984(b) cannot reach back in time for an unlimited period, as follows:

  No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

47.  Your Affiant is advised that § 984 (b) applies so long as the "action" to forfeit the property is commenced within one year from the date of the offense giving the basis for the forfeiture. As described above, the dates of the offense giving rise to the seizure are within the one year period.

48.  In cases involving fungible property, § 984 provides that property is subject to forfeiture if it is identical to otherwise forfeitable property, is located or maintained in the same way as the original forfeitable property, and not more than one year has passed between the time the original property subject to forfeiture was so located or maintained and the time the forfeiture action was initiated by seizing the property or filing the complaint, regardless of whether or not

the fungible property was continuously present or available between the time it became forfeitable and the time it was seized. Money Laundering Enforcement Amendments of 1991, H.R. Rep. No. 102-28 (Mar. 20, 1991), 1991 WL 42201; *see also American Express Bank*, 832 F. Supp. at 558 (quoting legislative history to the effect that Section 984 applies to money in seized accounts to the extent that money involved in money laundering or structuring existed in those accounts within one year of the seizure).

49. Thus, your Affiant is advised that § 984 makes the property in the accounts specifically sought for forfeiture, are subject to forfeiture and seizure to and including February 27, 2020.

## TRACING AND THE LOWEST INTERMEDIATE BALANCE THEORY

50. Your Affiant is advised that another theory of forfeiture allows the Government to forfeit funds and assets actually traceable to the wrongdoing. When tracing forfeitable funds through a bank account, the Government may use any generally accepted accounting method, including "first in, first out" or "first in, last out," but the Government will always be constrained by the lowest intermediate balance principle. *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158-62 (2d Cir. 1986); *United States v. $88,029.08, More or Less, in U.S. Currency*, 2012 WL 4499084, *5 (S.D. W. Va. Sept. 28, 2012) (applying the lowest intermediate balance rule to grant summary judgment as to the forfeitability of drug proceeds in a commingled bank account).

51. The lowest intermediate balance rule means that the amount of forfeitable funds on the date of the seizure may not exceed the lowest intermediate balance in the account between the date of the deposit of the allegedly forfeitable funds and the date of the seizure where the Government is relying on an actual tracing analysis, as opposed to relying on 18 U.S.C. § 984 for

seizure based on fungibility.

## CONCLUSION

52. Based on the foregoing, there is probable cause to believe that funds in the Target Accounts are proceeds of illegal activity or are derived from the proceeds of the illegal activities and are subject to forfeiture.

53. Due to the liquidity of bank accounts, particularly in consideration of electronic banking, such as ATMs, telephonic banking and online banking, funds can be moved with great ease.

54. For the reasons set forth above, Your Affiant therefore requests permission to seize the funds in the Target Accounts.

55. I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated: October 23, 2019

_____
Jacob Foiles
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on October 23, 2019

_____
SUSAN M. BAZIS, UNITED STATES MAGISTRATE JUDGE

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
для the
District of Nebraska

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>$108,919.36 United States Currency in JP Morgan Chase Bank Account Number 350818305 in the Name of "Vines Investments Inc." | Case No. 8:19MJ505 |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ District of ____Nebraska____ be seized as being subject to forfeiture to the United States of America. The property is described as follows:

$108,919.36 United States Currency in JP Morgan Chase Bank Account Number 350818305 in the Name of "Vines Investments Inc."

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before     11/06/2019
*(not to exceed 14 days)*

☑ in the daytime – 6:00 a.m. to 10:00 p.m.        ☐ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge _____Susan M. Bazis_____.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  10-23-19 at 4:04 p.m.                     *[signed]* Susan M. Bazis
                                                                                                          *Judge's signature*

City and state:   Omaha, Nebraska                                 Susan M. Bazis, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: 8:19MJ505 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| **Certification** |
|---|
|     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br>Date: _____<br><br>                                                                                _____<br>                                                                               *Executing officer's signature*<br><br>                                                                            _____<br>                                                                                 *Printed name and title* |